UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNION CAPITAL LLC, a New York Limited Liability   :   Case No.: 15-CV-9542
Company,       :

          :

          Plaintiff,       :

          :   **COMPLAINT**

      - against -       :

          :

PUGET TECHNOLOGIES, INC., a Nevada Corporation,   :   **JURY TRIAL DEMANDED**
and HERMANN C. BURCKHARDT       :

          :

          Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff, Union Capital LLC, by their undersigned attorneys, for their complaint, respectfully allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.     This is an action for securities fraud, breach of contract, tortious interference, a permanent injunction, and defamation arising as the result of defendants' conduct in connection with certain agreements to purchase securities.  After entering into negotiated, arms-length agreements, for which defendants received valuable consideration –and after repeatedly acknowledging the validity of the agreements—defendants attempted to renegotiate the terms of the agreements and threatened to breach the agreements if plaintiff did not agree.  After plaintiff declined to renegotiate, defendants retaliated by disseminating a letter falsely accusing plaintiff of "civil theft" and threatening plaintiff with "prosecution".  Defendants then compounded their misconduct by including this letter in public 8-K filings with the SEC, and sending it to several people in the securities industry in an effort to interfere with plaintiff's commercial relationships and damage plaintiff's reputation.  Accordingly, plaintiff seeks relief, as set forth below.

## PARTIES

2.      Plaintiff Union Capital LLC ("Union" or "plaintiff") is a limited liability company duly organized under the laws of the State of New York and having a principal place of business located at 338 Crown Street, Brooklyn, New York.

3.      The members of Union are Chaim A. Vail and Yakov Borenstein, each of whom resides in the State of New York.

4.       For purposes of diversity, Union is a citizen of New York.

5.      Upon information and belief, Defendant Puget Technologies Inc. ("PUGE") is a corporation organized and existing under the laws of the State of Nevada having its principal place of business located at 801 Brickell Avenue, Suite 900, Miami, Florida 33131.

6.      For purposes of diversity, PUGE is a citizen of Nevada.

7.      Puge is traded publicly under the symbol "PUGE."

8.      Upon information and belief, Defendant Herman C. Burckhardt ("Burckhardt") is an individual residing at 9796 NW 51st Terrace, Miami, Florida 33178.

9.      For purposes of diversity, Burckhardt is a citizen of Florida.

10.     Burckhardt serves as PUGE President and CEO, and is one of only two directors, officers, and/or employees of PUGE.

### JURISDICTION AND VENUE

11.     This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as various related state law claims.

12.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, .

13.      The Court also has jurisdiction pursuant to 28 U.S.C. §1332(a)(2) in that the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.      This Court has supplemental jurisdiction of Plaintiff's various state law claims pursuant to 28 U.S.C. section 1367(a).

15.      Venue is proper in this District pursuant to 27 U.S.C. §1391(a), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is subject of this action is situated.

16.      Additionally, in the relevant agreements, defendants consented to jurisdiction and venue in the Southern District of New York.

### FACT COMMON TO ALL CLAIMS FOR RELIEF

17.      On or about January 30, 2015, after arm's-length negotiations, PUGE executed a Convertible Redeemable Promissory Notes to Union (the "Note") in the amount of $75,000. A true and correct copy of the Note is attached hereto as Exhibit A.

18.      The Note provides that UNION, at any time after execution, has the right to convert all or part of the Note into shares of PUGE common stock (the "Common Stock").  Specifically, §4(a) of the Note provides in pertinent part:

> The Holder of this Note is entitled, at its option, at any time, to convert all or any amount of the principal face amount of this Note then outstanding into shares of the Company's common stock (the "Common Stock") …

Ex. A at 2, paragraph 4(a).

19.     In order to convert the Note, UNION was required to submit a Notice of Conversion to PUGE.  Accordingly, §3 of the Note provides, in pertinent part:

> Any Holder of this Note electing to exercise the right of conversion set forth in Section 4(a) hereof, in addition to the requirements set forth in Section 4(a), and any prospective transferee of this Note, also is required to give the Company written confirmation that this Note is being converted ("Notice of Conversion") in the form annexed hereto as <u>Exhibit A</u>.

20.     As §4(a) of the Note dictates, the price at which each respective Note was convertible (the "Conversion Price") was to be determined "for each share of Common Stock to be equal to 57.5% of the **<u>average of the three lowest closing bid prices</u>** of the Common Stock as reported on the National Quotations Bureau OTCQB exchange which the Company's shares are traded . . . for the *fifteen* prior trading days including the day upon which a Notice of Conversion is received by the Company…"

21.     Further, under §4(a), Notices of Conversion are to be "effectuated by the Company [PUGE] delivering the shares of Common Stock to the Holder within 3 business of receipt by the Company of the Notice of Conversion."

22.     In order to ensure that sufficient shares are available for conversion, §12 of the Note provides that "[t]he Company shall issue irrevocable transfer agent instructions reserving 6,000,000 shares of its Common Stock for conversion under this Note (the "Share Reserve")." Further, the Note requires that, "[t]he Company should at all times reserve a minimum of four times the amount of shares required if the Note would be fully converted.  The Holder [UNION] may reasonably request increases from time to time to reserve such amounts."

23.     Concurrently with the Note, PUGE issued a letter to its transfer agent ("TA"), Direct Transfer, LLC ("Direct Transfer"), noting that Direct Transfer was, and is:

Irrevocably authorized and instructed to reserve a sufficient number of shares of common stock ("Common Stock") of the Company (initially, 6,000,000 shares for the Note) for issuance upon full conversion of the Note in accordance with the terms thereof (the "Reserved Shares"). The Holder shall have the right to periodically request that the number of Reserved Shares be increased so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock issuable upon conversion of the Note.

The ability to convert the Note in a timely manner is a material obligation of the Company pursuant to the Note. Your firm is hereby irrevocably authorized and instructed to issue shares of Common Stock of the Company (without any restrictive legend) to the Holder without any further action or confirmation by the Company…

PUGE's Letter to Direct Transfer is attached as Exhibit B.

24.     The conversion feature of the Note is a material term as investment in PUGE was exceedingly risky. Therefore, UNION was only willing to purchase the Note if it could earn a return commensurate with the risk. UNION's ability to obtain stock at a discount to the market price and resell it on the open market provided UNION with an opportunity to earn such a return. Any failure by PUGE to honor Conversion Notices, therefore, deprives UNION of the essential benefit for which it negotiated, and for which it purchased, the Note.

25.     Following execution of the Note, PUGE, at least initially, acted in compliance with the terms of the first Note, accepting the benefits of UNION's investment and honoring several UNION conversions of PUGE stock thereunder.

26.     After acquiring the Note, on or about August 7, 2015, UNION duly submitted a Notice of Conversion to convert $1,000 of the balance of the Note into 99,818 shares of PUGE Common Stock, leaving a principal balance of $74,000.00, plus interest accruing thereupon, on the Note. Likewise, on October 14, 2015, Union duly submitted a Notice of Conversion to convert $7000 principal and $389.70 in interest of the balance of the Note into 4381,245 shares of PUGE

5

commons stock leaving a principal balance of $67,000.00 on the Note.  Finally, on October 20, 2015, Union duly submitted a Notice of Conversion to convert $2780 principal and $158.42 in interest of the balance of the Note into 1,517,910 shares of PUGE commons stock leaving a principal balance of $64,220.00 on the Note. Each of these conversion were honored and the requisite shares were delivered accordingly.  The Notice of Conversion dated August 7, 2015, October 14, 2015 and October 20, 2015 is attached hereto as Exhibit C.

27.    On or about September 16, 2015, PUGE sent a proposal letter ("Proposal") to its note holders, seeking to augment the terms of its securitized notes.  PUGE's September 16, 2015 Proposal is attached hereto as Exhibit D.

28.    In addition to admonishing the performance of PUGE's former CEO, Larson Elmore, and touting *potential* new hires, the Proposal sought to require UNION, and similarly-situated note holders, inter alia, to: (i) cease converting any portion of any Note for a period of six (6) months; (ii) permit PUGE, in PUGE's sole discretion, to increase the moratorium on conversion for an additional three months at PUGE's discretion. Exhibit D.

29.    On or about October 15, 2015, after UNION declined to renegotiate the terms of the Note, new PUGE President and CEO, Hermann Burckhardt emailed UNION a copy of a "Civil Theft Letter," accusing UNION of engaging in a scheme to defraud and theft from PUGE followed by an alleged opinion letter from PUGE's counsel dated October 16, 2015.  PUGE's "Civil Theft Letter" and October 16, 2015 letter is attached hereto as Exhibit E.  PUGE's allegations are patently false.

30.    According to PUGE's Form 8-K, filed with the SEC on October 1, 2015, Burckhardt signed a 5-year contract with PUGE. The compensation for Burckhardt's position with PUGE has granted him a 10% interest stake in the company in addition to salary of $8,000 per

month for six months, which escalates over the life of the contract to a maximum of $15,000 for the last 3 years of the contract.

31.     The Civil Theft Letter alleges that UNION contracted for loans that are "clearly fraudulent."   However, UNION furnished money to PUGE under a negotiated, arms-length promissory note, duly executed by PUGE.

32.     Furthermore, in negotiating the Note, the parties were each represented by sophisticated counsel.

33.     The Civil Theft Letter further alleges that lenders "arranged a default on inception." But UNION was in no position to do so as it had no control over PUGE at any time.

34.     Additionally, the Civil Theft Letter alleges that: "the lender was paid a huge commission."   Yet, the Civil Theft Letter neither specifies what commission, if any, was paid, nor does it articulate why this alleged commission was "huge."   In any event, no commission was paid.

35.     The Civil Theft Letter further alleges that: "UNION is acting in concert with New Venture Attorneys, using questionable and identical attorney opinions from New Venture Attorneys." Upon information and belief, the Civil Theft Letter's reference to "New Venture Attorneys" refers to Tomer Tal, who has represented the lender Union.   But UNION never acted in concert with Adar Bays LLC or Tomer Tal concerning PUGE nor was Tomer Tal or New Venture Attorneys an investor in or lender to PUGE.

36.     On October 20, 2015, PUGE announced in its public 8-K filing that UNION was the subject of an "investigation" and attached the text of the Civil Theft Letter.   PUGE's October 20, 2015 8K filing is attached as Exhibit F.

37.     The Civil Theft Letter constitutes the dissemination of false and misleading statements in connection with the purchase and sale of securities through the participation in a

fraudulent scheme and course of conduct.  Furthermore, the information contained in the Civil Theft Letter is material.  The statements propagated therein permitted PUGE to lay blame for its poor financial condition on UNION.  Burckhardt and PUGE's affirmative statement that, "the days of pushing this Company around are over," and that, "the remaining Note Holders should be aware that the company will pursue these matters vigorously," effectively conveyed to investors and potential investors the deceptive notion that PUGE was not responsible for the volatility of its stock or its fiscal state, and artificially influenced PUGE's perceived market value and investor perceptions of the company in the short-term.

38.     The principals of UNION have been well-known in the investment and business community for at least 8 years.

39.     UNION is an accredited investor.  UNION and its principals have been in the business of providing publicly-held corporations' short-term loans and have developed an established reputation among lenders and publicly-held corporations alike.  The reputation of short-term lenders, such as UNION, is important insofar as poorly-reputed short-term lenders are not provided the same quantity and quality commercial opportunities as well-reputed short-term lenders.

40.     Upon information and belief, PUGE and/or Hermann Burckhardt's publicly disseminated and false accusations about UNION have harmed UNION's reputation, including its reputation in the community for stellar management, among lenders and publicly-held corporations alike.

41.     This is not the first time Mr. Burckhardt has made false statements to a governmental agency.  In 1985, the National Association of Securities Dealers fined and censured Mr. Burckhardt for multiple violations of SEC rules with respect to broker-dealer annual reporting,

audit and notification requirements.   Among the violations, Mr. Burckhardt filed inaccurate Financial and Operational Combined Uniform Single Reports ("FOCUS").   The FOCUS reports are expected to be filed monthly and quarterly and provide an update to the Firm's annual audited financial statement.   Mr. Burckhardt paid a small amount of the fine (less than 10%) then made no additional payments.   As a result, his registration as a broker-dealer was revoked.

42.      Upon information and belief, PUGE has but two directors, investors, and/or employees, including Mr. Burckhardt.[1]

43.      On or about November 12, 2015 UNION duly submitted a Notice of Conversion to convert $2,150 of the balance of the Note into 554,102 shares of PUGE Common Stock, leaving a principal balance of $62,070 plus interest accruing thereupon, on the Note.   The November 12, 2015 Notice of Conversion is attached hereto as Exhibit G.

44.      The November 12, 2015 Notice of Conversion was ignored by PUGE.   However, the stock transfer agent responded by asserting it did not have enough shares in reserve.

45.      On or about November 19, 2015, seeking to assist PUGE in remedying its failure to authorize the increase of the Share Reserve, UNION sent PUGE and the transfer agent a Reserve Increase Letter, requesting that the reserve be increased and that PUGE authorize the increase by signing the Reserve Increase Letter. The reserve increase letter is attached hereto as Exhibit H.

46.      Although not required to do so under the terms of the Note, on or about November 23, 2015, Union sent PUGE a Notice of Default, inter alia, setting forth the numerous defaults that had taken place as the result of PUGE's conduct.   A copy of the Notice of Default is attached hereto as Exhibit I.

---

[1] In addition to Mr. Burckhardt, Thomas Jaspers serves as the company's Chief Financial Officer (CFO).

47.     PUGE ignored the Notice of Default, and failed to cure its defaults within the applicable cure period.

48.     Without legitimate excuse or justification, PUGE refused to deliver to UNION the shares of Common Stock that it was obligated to deliver upon receiving such Conversion Notice.

49.     To date, PUGE remains in default and has yet to honor UNION's October 12, 2015 conversion and November 19, 2015 Request to Increase Shares.

50.     Based on the foregoing events, PUGE's failure to honor UNION's October 12, 2015 Notice of Conversion has effectively given rise to an "Event of Default" pursuant to the terms the Note. In addition thereto, PUGE's subsequent conduct has caused no fewer than four (4) supplemental "Events of Default" to occur.

51.     With regard to the November 12, 2015 Notice of Conversion, PUGE defaulted under §8(k) of the Note, which states that an "Event of Default" shall occur if "the Company shall not deliver to the Holder the Common Stock pursuant to paragraph 4 herein without restrictive legend within 3 business days of its receipt of a Notice of Conversion." Ex. A at 5.

52.     As PUGE did not deliver the shares within three (3) business days PUGE's receipt of the Notice of Conversion, and this failure was not cured within five (5) business days, PUGE is and remains in default under §8(k) of the Note. Ex. A at 5.

53.     Second, PUGE is in default under §8(l) of the Note, which provides that an "Event of Default" shall transpire if "the Company shall not replenish the reserve set forth in Section 12 within 3 business days of the request of the Holder. Ex. A at 5.

54.     Because UNION requested an increase in the Reserve on November 19, 2015, which was not honored by PUGE, PUGE is in default under §8(l) of the Note.   Ex. A at 5.

55.     Third, by failing to facilitate UNION's November 12, 2015 Notice of Conversion, PUGE effectively rendered itself in default of §8(b) of the Note.  Ex. A at 4.  Section 8(b) provides that an "Event of Default" shall occur if, "[a]ny of the representations or warranties made by the Company herein or in any certificate or financial or other written statements heretofore or hereafter furnished by or on behalf of the Company in connection with the execution and delivery of this Note, or the Securities Purchase Agreement under which this note was issued shall be false or misleading in any respect."  Ex. A. at 4.

56.     Under §4 of the Note, PUGE agreed that the Holder, UNION, would be entitled to convert all or any amount of the principal face amount of the Note then outstanding into shares of the Company's Common Stock *at its option*.  Ex. A at 5.  By neglecting to effectuate UNION's conversion, PUGE has provided to UNION an irrevocable option to convert any or all of the remaining principal value of the Note.

57.     PUGE is further in default under §8(d) of the Note, which states, in pertinent part, that an Event of Default shall occur if: "[t]he Company shall…(2) admit in writing its inability to pay its debts generally as they mature..."

58.     In the PUGE Proposal, PUGE asserted, "As a result of the previous setbacks we lacked the ability and vision to move ahead," and, with respect to the concessions PUGE was seeking, that, "[t]he Company needs you to grant us the following terms to move forward."  In closing, the Proposal notes that, "[w]hat we are looking at if we cannot come to an agreement is a bidding war with the stock being so affected that it would probably make our business plan impractical."  The Proposal itself, conveyed to UNION in writing, demonstrates PUGE is unable to pay its debts as they mature.

59.     PUGE further alludes to its inability to pay its debts as they become due in its September 23, 2015 filing with the Security and Exchange Commission (SEC)("Form 10-QA"). In PUGE's Form 10-QA, the company notes that, "the Company has incurred losses since inception resulting in an accumulated deficit of $1,505,530 as of July 31, 2015 and further losses are anticipated in the development of its business raising substantial doubt about the Company's ability to continue as a going concern." PUGE's September 23, 2015 10-QA is attached hereto as Exhibit J.

60.     Finally, PUGE is in default under §8(c), which mandates that an "Event of Default" shall occur if "the Company shall fail to perform or observe, in any respect, any covenant, term, provision, condition, agreement or obligation of the Company under this Note or any other note issued to the Holder."

61.     Despite the fact that, under §6 of the Note PUGE expressly waived notice, UNION has on multiple occasions reminded PUGE of its obligations and has provided it a Notice of Default. See Exhibit I.

62.     At no point has UNION' ever, whether formally or informally, in writing or orally, waived PUGE's defaults.

63.     Section 8 of the Note outlines the negotiated-for and agreed-upon remedies for the differing Events of Default. First, §8 mandates that, "[u]pon an Event of Default, interest shall accrue at a default interest rate of 24% per annum, or if such rate is usurious or not permitted by current law, then at the highest rate of interest permitted by law."

64.     Moreover, PUGE's breaches trigger default payments of "$250 per day the shares are not issued beginning on the 4th day after the conversion notice was delivered to the Company."

Beginning on the 10th day that the shares are not issued, this payment, "shall increase to $500 per day." Ex. A. at 5.

65.     Due to PUGE's persistent and willful failure to remedy its various breaches, as of filing the instant action, default interest has been accruing at a rate of 24%.

66.     The default payments under the Note were reasonable at the time of entering the contract and are not grossly disproportionate to the conceivable losses that could occur from a breach.  First, stocks such as PUGE's are volatile, making the timing of conversion and sale of the stock on the open market important.  Second, the ability to convert at a discount and sell on the open market, particularly in an upswing in the stock price, afforded UNION with an opportunity to make profits well beyond the amount daily default payments.

67.     UNION has been, and continues to be, irreparably harmed by PUGE's failure to honor the Notice of Conversion.

68.     First, damages from PUGE's failure to deliver the shares are inherently uncertain and difficult to calculate.   Since the parties entered in the Note in January 2015, PUGE's Stock price has ranged from $0.1 per share to just $0.0077 per share.  Thus, the timing of conversions and sale of stock would be essential to the determination of damages.  Because it is impossible to discern with any accuracy precisely when UNION would have sold the converted shares, and how many it would sell had the conversion been honored, calculating its losses is impossible.  PUGE's stock chart is attached hereto as Exhibit K.

69.     Next, PUGE is nearing insolvency, if not insolvent already.  According to PUGE's Form 10-QA (Ex. J), the company's most recent Quarterly Report filed with the Securities and Exchange Commission, PUGE is carrying over $1,650,000 million in liabilities (up from $951,229 in October 2014), compared to a mere $327,119 in total assets.  Further, PUGE's cash flows from

operations evidence a net loss of $630,554 for the nine months ended July 31, 2015 and its income

from operations has the company in the red for a total of ($284,434).  Finally, and most glaringly,

at current, PUGE maintains a total stockholders' deficit of $838,655.

70.     PUGE's Board statements contained in the Form 10-QA reiterate this financial

hardship, stating:

> The ability to continue as a going concern is dependent upon the Company
> generating profitable operations in the future and/or to obtain the necessary
> financing to meet its obligations and repay its liabilities arising from normal
> business operations when they come due.  Management intends to finance operating
> costs over the next twelve months with existing cash on hand and loans from
> directors or third parties and or private placement of common stock.

71.     As such, without injunctive relief, PUGE is unlikely to satisfy any monetary

judgment and UNION will suffer irreparable harm.

**FIRST CLAIM FOR RELIEF**
**(<u>SPECIFIC PERFORMANCE</u>)**

72.     UNION realleges and incorporates by reference each and every allegation

contained in all preceding paragraphs of this Complaint as if fully set forth herein.

73.     Pursuant to the agreements between them, PUGE is obligated to deliver 554,102

shares of its Common Stock, along with the necessary resolutions and acceptance of the legal

opinions furnished by UNION, sufficient to enable UNION to sell the shares publicly without

restriction.

74.     Pursuant to the agreements between them, PUGE is obligated to increase the

number of Reserved Shares so that the number of Reserved Shares at least equals 400% of the

number of shares of the Company common stock required if the Note would be fully converted.

75.     Despite its obligation to do so, PUGE has failed and refused to deliver said shares of stock to UNION.

76.     Despite its obligation to do so, PUGE has failed and refused to increase the number of Reserved Shares so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock required if the Note would be fully converted.

77.     As a result of such refusal by PUGE, UNION has suffered damages.

78.     UNION has no adequate remedy at law.

79.     In the absence of injunctive relief, UNION will suffer irreparable harm.

80.     UNION requests, therefore, that the Court enter and order requiring PUGE to deliver immediately to UNION 554,102 shares of its Common Stock, along with the necessary resolutions and acceptance of the legal opinions furnished by UNION, sufficient to enable UNION to sell the shares publicly without restriction, and that PUGE immediately increase the number of Reserved Shares so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock required if the Note would be fully converted.

**SECOND CLAIM FOR RELIEF**
**(<u>BREACH OF CONTRACT</u>)**

81.     UNION realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

82.     UNION's conduct constitutes a breach of, and default under, the terms of the Note and related agreements.

83.     Plaintiff has performed all obligations of the relevant agreements that were its obligation to perform except for those obligations that it could not perform because of defendants' breaches herein.

15

84.     PUGE's breach and default are governed by New York law under the terms of the Note.

85.     UNION, therefore, is entitled to an award of damages in an amount to be determined at trial, but no less than seventy-five thousand dollars ($75,000).

### THIRD CLAIM FOR RELIEF
### (CONVERSION)

86.     UNION realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

87.     UNION has a right to possession of the shares that PUGE has refused to deliver which right is superior to PUGE's right to possess those shares.

88.     PUGE has wrongfully asserted dominion over the shares.

89.     Despite due demand, UNION has refused to turn the shares over to UNION.

90.     PUGE has wrongfully interfered with UNION's right to possess those shares which interference constituted conversion of those shares by PUGE.

91.     As a result of PUGE's wrongful conversion of the shares, UNION has been damaged.

92.     UNION, therefore, is entitled to an award of damages in an amount to be determined at trial, but no less than seventy-five thousand dollars ($75,000).

### FOURTH CLAIM FOR RELIEF
### (TORTIOUS INTERFERANCE WITH PROSPECTIVE BUSINESS ADVANTAGE)

93.     UNION realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

94.     UNION's business, which consists of providing loans to distressed public companies, has been harmed by the baseless allegations of PUGE in its Civil Theft Letter.

95.     PUGE and Hermann Burckhardt have committed culpable conduct by making accusations of fraud and theft and payment of improper commissions with intent, or at least reckless disregard of the truth.

96.     PUGE and Hermann Burckhardt made its accusations public by filing its Civil Theft Letter as part of its Form 8K submission to the (SEC).  Such filings are publicly available online through the SEC's heavily-trafficked Edgar website (URL:www.sec.gov/edgar/searchedgar/companysearch.html).

97.     Hermann Burckhardt exercises complete dominion and control over PUGE, and has caused PUGE to engage in a course of deceptive conduct, including causing PUGE to make false public accusations about Plaintiff and other lenders to the detriment of its shareholders, and for the purpose of benefiting himself individually.

98.     PUGE and Hermann Burckhardt made, or was caused to make, its false allegations with the purpose of increasing its own stock price and personally benefiting Hermann Burckhardt.

99.     UNION has suffered substantial damages as a result of PUGET and Mr. Burckhardt's conduct.

100.     UNION, therefore, is entitled to an award of damages in an amount to be determined at trial, but no less than seventy-five thousand dollars ($75,000.00).


**FIFTH CLAIM FOR RELIEF**
**(VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5 PROMULGATED THEREUNDER)**

101.    UNION realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

102.    PUGE's false allegations and omissions in its Civil Theft Letter were material in that a reasonable shareholder would consider them important in deciding how to vote.

103.    The false allegations and omissions in the Civil Theft Letter are also material, in that, by offering UNION as a scapegoat for PUGE's financial woes, the statements served to exert influence upon PUGE's securities by providing holders and potential purchasers of PUGE stock artificial confidence in the company's fiscal condition and stability.  Burckhardt benefited directly from the artificial increase in the stock price, allowing to draw an excessive salary of $8,000 per month, and his 10% shareholder interest in PUGE.

104.    In releasing the Civil Theft Letter, PUGE and Burckhardt, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of a national exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The false and misleading statements and omissions contained in the Civil Theft Letter were intended to and did, as alleged herein: (i) deceive the investing public; (ii) artificially influence the value of PUGE securities; and, (iii) cause Plaintiff and other investors damage as a result of the statements contained therein.

105.    PUGE and Burckhardt were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

106.    As described, PUGE and Burckhardt made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the investing public who relied upon such statements.

107.    The knowledge of Defendant Burckhardt, as PUGE's control person, are imputed to PUGE.

108.    Moreover, as a party to the sham alleged herein, with knowledge (through Burckhardt) that the purpose and effect of the actions described herein was to manipulate and materially misstate PUGE's financial condition to benefit Burckhardt's compensation and the value of his shares in PUGE, Burckhardt and PUGE are liability under Section 10(B) and Rule 10b-5.

109.    PUGE and Burckhardt's false statements and omissions were made in connection with the purchase and/or sale of PUGE's securities.

110.    Hermann Burckhardt's conduct constitutes a violation of fiduciary duty owed to PUGE.

111.    Burckhardt's conduct has harmed PUGE by substantially increasing PUGE's credit risk in the eyes of lending institutions and has degraded the integrity of PUGE's enterprises and securities.

112.    UNION has standing to sue derivatively as a shareholder of PUGE.

113.    UNION has suffered substantial damage as a result of defendants' conduct.

114.    UNION, therefore, is entitled to an award of damages in an amount to be determined at trial, but no less than seventy-five thousand dollars ($75,000.00).

## SIXTH CLAIM FOR RELIEF

**(CONTROLLING PERSON LIABILITY PURSUANT TO SECTION 20(A) OF THE
SECURITIES EXCHANGE ACT OF 1934 AGAINST DEFENDANT BURCKHARDT)**

115.    UNION realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

116.    This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendant Burckhardt.

117.    Defendant Burckhardt was the controlling person of PUGE at the time the Civil Theft Letter was disseminated as a result of his position as President and Chief Executive Officer.

118.    By virtue of the foregoing, Burckhardt had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of PUGE, including the content and dissemination of PUGE's financial statements and the Civil Theft Letter.

119.    Defendant Burckhardt did not act in good faith in connection with the conduct at issue in this claim.  Further, Burckhardt directly or indirectly induced the act or acts constituting violations of Section 10(b) and Rule 10b-5 by PUGE, among other things, orchestrating sham releases of materially misleading information that caused PUGE's condition to be materially misstated, and the dissemination of false information to investors and prospective investors.

120.    Defendant Burckhardt is liable for participation in the matters alleged herein because he acted with knowledge that PUGE's public statements were materially false or misleading, or omitted material information, or acted with reckless disregard for the truth.

121.    By virtue of his position as controlling person of PUGE, Defendant Burckhardt is jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as PUGE.

**SEVENTH CLAIM FOR RELIEF
(PIERCING THE CORPORATE VEIL)**

122.    UNION realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

123.    Mr. Burckhardt recently caused PUGE to sign an employment contract for a 5 year term whereby Mr. Burckhardt will receive an excessive compensation of $8,000 per month for the first six months of his employment to a maximum of $15,000 per month for the last three years of the contract.

124.    Mr. Burckhardt has admitted on a number of occasions to inadequate capitalization of PUGE, a function of Mr. Burckhardt's mismanagement of its assets.

125.    Mr. Burckhardt's manages PUGE as an alter ego of himself personally.

126.    UNION has suffered substantial damages as a result of PUGE's conduct.

127.    Therefore, UNION is entitled to pierce the corporate veil, and allowing damages for Mr. Burckhardt's deceptive conduct to be paid from Mr. Burckhardt personally.

## EIGHTH CLAIM FOR RELIEF
### (<u>DEFAMATION</u>)

128.    UNION realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

129.    UNION is not a public figure.

130.    Mr. Burckhardt and PUGE's statements in its published Civil Theft Letter were intentionally false or at least made in reckless disregard of the truth, and were otherwise grossly irresponsible in that the statements were made without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.  The false statements were of a character that would tend to injure a person in his business trade or profession.

131.    UNION has suffered substantial and special damages as a result of PUGET and Mr. Burckhardt's conduct in New York and elsewhere as a result of PUGE's Conduct.

132.    UNION, therefore, is entitled to an award of damages in an amount to be determined at trial, but no less than seventy-five thousand dollars ($75,000.00).

## NINTH CLAIM FOR RELIEF
## (PERMANENT INJUNCTION)

133.    UNION realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

134.    Pursuant to its obligations under the relevant agreements, PUGE is obligated to deliver shares of its Common Stock, along with the necessary resolutions and acceptance of the legal opinions furnished by UNION, sufficient to enable UNION to sell the shares publicly without restriction.

135.    Despite its obligation to do so, PUGE has failed and refused to deliver said shares of stock to UNION.

136.    Pursuant to its obligations under the relevant agreements, PUGE is obligated to increase the number of Reserved Shares so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock required if the Note would be fully converted.

137.    Despite its obligation to do so, PUGE has failed and refused to increase the number of Reserved Shares so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock required if the Note would be fully converted.

138.    PUGE has also publically filed a false and defamatory letter, falsely accusing plaintiff of criminal conduct.

139.    As a result of such refusal by PUGE, UNION has suffered damages.

140.    UNION has no adequate remedy at law.

141.    In the absence of injunctive relief, UNION will suffer irreparable harm

142.    UNION requests, therefore, that the Court enter an order enjoining and requiring PUGE to deliver the shares of stock as called for in the relevant agreements, increase the number of Reserved Shares so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock required if the Note would be fully converted, withdraw its October 20, 2015 8K filing, to refrain from further interference with UNION's prospective economic advantage, and further requiring PUGE to file a statement with the SEC noting that the Court has found PUGE had made misrepresentations of fact in its October 20, 2015 8K filing order and required PUGE to withdraw said filing on that basis.


**TENTH CLAIM FOR RELIEF**
**(COSTS, EXPENSES & ATTORNEYS FEES)**


143.    UNION realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

144.    In accordance with the agreements between the parties, PUGE agreed to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by UNION in collecting any amount under the Note or breach of the Agreements.

145.    First, §7 of the Note states, "[t]he Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note."

146.    Next, §8 of the Note states, "[i]f the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging and attorney, then, if the Holder prevails in such action, the Holder shall be reimbursed by the Company for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding."

147.    Therefore, UNION is entitled to an award against PUGE for costs and expenses incurred in the prosecution of this lawsuit, including reasonable legal fees.

## CLAIM FOR RELIEF

**WHEREFORE**, Plaintiff UNION seeks judgment against Defendant PUGET TECHNOLOGIES, INC. as follows:

i.    On the First Claims for Relief, UNION requests an order requiring PUGE to immediately deliver to UNION 554,102 shares of its Common Stock, along with the necessary resolutions and acceptance of contractually required legal opinions furnished by UNION, sufficient to enable UNION to sell the shares publicly without restriction; and

ii.    On the First Claim for Relief UNION further requests an order requiring PUGE to increase the reserves of its Common Stock by an additional 60,000,000 shares and as may be requested by UNION in the future; and

iii.    On all Claims for Relief, an order requiring PUGE to take all necessary steps to increase the authorized shares of PUGE so as to comply fully with the terms of the Note;

iv.    On all Claims for Relief, for damages in an amount to be determined, but not less than seventy-five thousand dollars ($75,000); and

v.    On the Tenth Claim for Relief for an award of UNION's costs and expenses in prosecuting this action, including reasonable legal fees;

vi.      On the Ninth Claim for Relief, the issuance of an injunction enjoining and requiring PUGE to deliver the shares of stock as called for in the relevant agreements, increase the number of Reserved Shares so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock required if the Note would be fully converted, amend its October 20, 2015 8K filing, to refrain from further interference with UNION's prospective economic advantage, and further requiring PUGE to file a statement with the SEC noting that the Court has found PUGE had made misrepresentations of fact in its October 20, 2015 8K filing order and required PUGE to amend said filing on that basis.; and

vii.     On the Sixth and Seventh Claim for Relief, an order allowing Mr. Burckhardt to be held personally liable for all acts of self-dealing and violation of fiduciary duty to PUGE;

viii.    On all Claims for Relief, for interest, attorneys' fees and the costs and disbursements of this action; and

ix.      For such other further relief as the Court may deem just, proper, and in the interest of justice.

**JURY DEMAND**

Plaintiff demands a trial by jury in this matter.

Dated: December 7, 2015
        New York, New York

                        LAW OFFICE OF JEFFREY
                        FLEISCHMANN PC
                            By: /s/Jeffrey Fleischmann
                                Jeffrey Fleischmann, Esq. (JF-3172)

                            *Attorneys for Plaintiffs*
                            65 Broadway, Suite 842
                            New York, N.Y. 10004
                            Tel. (646) 657-9623
                            Fax (646) 351-0694
                            jf@lawjf.com